IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

JEROME BELL, JAMES SHEPPARD,
MARTEZE HARRIS, DOMONIC
BUTLER, MICHAEL DAVIS, RICKY
LAMBERT, JARMALE WALKER, *et al.*

Plaintiffs,

v.

THE CITY OF JACKSON,
MISSISSIPPI

Defendant.

Case No. 3:15-cv-732 TSL-RHW
(CLASS ACTION)

SOUTHERN DISTRICT OF MISSISSIPPI
FILED

OCT - 9 2015

ARTHUR JOHNSTON
BY_____ DEPUTY

## CLASS ACTION COMPLAINT

### Introduction

The Plaintiffs in this case are impoverished people who were incarcerated by the Defendant City of Jackson, Mississippi ("the City") because they were unable to pay debts allegedly owed to the City for traffic violations and other misdemeanor offenses. In each case, the City required the Plaintiff to pay all (or a large part) of his debt immediately or be incarcerated at the Hinds County Jail or the Hinds County Penal Farm.[1]  In the language of the City's municipal court, the Plaintiffs were ordered to "pay or stay."  Due to their poverty, the Plaintiffs were unable to pay the amounts of money demanded by the City and thus were required to stay in jail.  None of the Plaintiffs were afforded the inquiry into their ability to pay that is required by the United States Constitution and Mississippi law.  Once incarcerated, the Plaintiffs were told that they could "work off" their fines at the rate of $58.00 per day, while

---

[1] Hinds County operates two jails, one in Jackson, Mississippi and one in Raymond, Mississippi.  In this Complaint, the phrase "Hinds County Jail" or "Jail" is used to refer to both facilities.  The Hinds County Penal Farm, a third secure detention facility operated by the County, is also located in Raymond, Mississippi.

those who were unable to work were told that they must "sit out" their fines at the rate of $25.00 per day.

The treatment of the Plaintiffs is representative of the systemic illegality perpetrated by the City against some of its poorest residents.  The City, as a matter of policy and practice, engages in the same conduct against numerous poor people on a daily basis, unlawfully incarcerating them if they are too poor to pay the fines, fees, and costs arising from traffic violations and other misdemeanor offenses.  These practices – and the modern day debtors' prison they have created – have no place in our society.

By and through their attorneys and on behalf of themselves and all others similarly situated, the Plaintiffs seek declaratory and injunctive relief to end and remedy the City's policies and practices, which violate United States and Mississippi law, and money damages to compensate them for the time they spent unlawfully incarcerated at the jail or penal farm.

### Nature of the Action[2]

1.      It is the policy and practice of the Defendant City of Jackson to incarcerate people when they cannot afford to pay debts owed to the City for traffic violations and other misdemeanor offenses without conducting any inquiry into the person's ability to pay and without considering alternatives to imprisonment as required by United States and Mississippi law.

2.      It is the policy and practice of the City to incarcerate indigent people for their debts without providing adequate counsel to represent them during court proceedings.

3.      It is the policy and practice of the City to incarcerate people in the Hinds County Jail or the Hinds County Penal Farm to "sit out" their debts at the rate of $25.00 per day and to

---

[2] Plaintiffs make the allegations in this Complaint based on personal knowledge as to matters in which they have had personal involvement and on information and belief as to all other matters.

coerce inmates into performing physical labor by telling them that the length of their incarceration will be reduced if they "work off" their debts at the rate of $58.00 per day.

4.      It is the policy and practice of the City to use incarceration, and the threat of incarceration, to coerce payments from impoverished debtors and their family and friends. The City's prosecutors and other officials call this scheme the City's "pay or stay" policy.

5.      Plaintiffs seek declaratory, injunctive, and compensatory relief.

## Jurisdiction and Venue

6.      This is a civil rights action arising under 42 U.S.C. § 1983, 18 U.S.C. § 1595, and 28 U.S.C. § 2201, *et seq.*, and the Sixth, Thirteenth, and Fourteenth Amendments to the United States Constitution. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

7.      Venue in this Court is proper pursuant to 28 U.S.C. § 1391.

## Parties

8.      Plaintiff Jerome Bell is a 58-year-old resident of Jackson, Mississippi; James Sheppard is a 61-year-old resident of Jackson, Mississippi; Marteze Harris (aka Martez Harris) is a 25-year-old resident of Jackson, Mississippi; Domonic Butler is a 27-year-old resident of Jackson, Mississippi; Michael Davis is a 34-year-old resident of Jackson, Mississippi; Ricky Lambert is a 41-year-old resident of Flowood, Mississippi; and, Jarmale Walker (aka Jermale Walker) is a 26-year-old resident of Jackson, Mississippi. These Named Plaintiffs represent themselves as individuals and a Class of similarly situated people all subject to the City's illegal debt-collection scheme.

9.      Defendant City of Jackson is a municipal corporation, organized under the laws of the State of Mississippi, that operates the Jackson Municipal Court and employs the City prosecutors and other officials and employees who implement the City's "pay or stay" scheme,

3

and that collects debts from the fines, fees, and costs assessed for traffic violations and misdemeanor convictions in its Municipal Court.

## Factual Background

### A.     The Plaintiffs

#### Plaintiff Jerome Bell

10.     Jerome Bell is a 58-year-old individual with physical disabilities. He is a resident of Jackson, Mississippi.

11.     On or about July 10, 2015, Mr. Bell was arrested and brought to the City's Municipal Court because he allegedly owed the City money for traffic violations and related fines, fees, and costs. At the Municipal Court, the City's prosecutor demanded that Mr. Bell pay $4,759.00 or go to jail.

12.     Mr. Bell is disabled and therefore unable to work. Mr. Bell's only income is a small monthly check that he receives through the Social Security and Supplemental Security Income disability program. He uses his limited income to support himself, his partner, and her teenage grandson. Based on his estimated income in 2014, Mr. Bell was subsisting below the federal poverty level even for a household of one. Indeed, Mr. Bell relies on the Supplemental Nutrition Assistance Program (SNAP or "food stamps") and a monthly "Senior Citizen box" from a local church to feed himself and his family. Mr. Bell does not own a house, car, or any other significant assets.

13.     Consistent with standard policy and practice, the City's public defender did not meet with Mr. Bell prior to or during the hearing to discuss the allegations and charges against him or his ability to pay. The City's public defender made no attempt to review the alleged charges, fines, fees, and costs or Mr. Bell's payment history or to determine whether the records

relied upon by the City were accurate.  The City's public defender, pursuant to standard policy and practice, made no request that the court consider Mr. Bell's ability to pay his alleged debts.

14.    Pursuant to standard policy and practice, neither the City's prosecutor nor the City's municipal court judge made any inquiry into Mr. Bell's ability to pay or into any alternatives to imprisonment as required by United States and Mississippi law.  Instead, the prosecutor requested and the judge ordered that Mr. Bell "pay or stay."  Because Mr. Bell was unable to pay the thousands of dollars demanded by the City, he was incarcerated.  *See* Ex. A.

15.    The City's public defender did not contest the lawfulness of the "pay or stay" order or otherwise object to the treatment of Mr. Bell.

16.    Due to his disabilities, Mr. Bell was unable to "work off" his fines at the County Penal Farm.  The penal farm was also unable to provide Mr. Bell with adequate medical care, and thus he was incarcerated at the dangerous and overcrowded Hinds County Jail.[3]  For more than twenty (20) days, Mr. Bell slept on the concrete floor of a holding cell in the booking unit of the jail with no mattress or cushion of any sort.[4]

17.    Mr. Bell began sitting out his debt at the jail at the rate of $25.00 per day.  At that rate, he would have spent approximately 190 days in jail before he was released.  If not for his disabilities, Mr. Bell would have been allowed by the City to "work off" his debt at the penal farm at the rate of $58.00 per day, which would have taken him approximately 82 days.

---

[3] On May 21, 2015, the Civil Rights Division of the United States Department of Justice notified the Hinds County Board of Supervisors and Hinds County Sheriff Tyrone Lewis that it had concluded that "[c]onstiutional deficiencies at the Jail violate prisoners' Eighth and Fourteenth Amendment rights."  DOJ, *Investigation of Hinds County Detention Center*, 2 (May 21, 2015), *available at* http://www.justice.gov/file/440946/download (hereinafter "DOJ Investigation").  Among other things, the DOJ noted that "[t]he Jail does not provide prisoners with reasonable safety and minimum levels of protection from violence by other prisoners and staff members."  *Id.* at 2.

[4] Mr. Bell was moved to a housing unit and provided with a bed only after complaints were made by undersigned counsel.

18.      On August 14, 2015 – thirty-five days after Mr. Bell was imprisoned at the jail –
undersigned counsel requested that one of the City's municipal court judges reconsider Mr.
Bell's incarceration.  Through undersigned counsel, Mr. Bell argued that he was too poor to pay
his debt and thus that the City must offer him an opportunity to perform public service or some
other alternative to payment or incarceration.  Because of the City's policies and practices, this
was the first time that any inquiry was made into Mr. Bell's ability to pay.  The City's municipal
court judge eventually released Mr. Bell and ordered him to complete more than 500 hours of
public service to satisfy his debt.

19.      On the same day that the court ordered Mr. Bell's release, undersigned counsel,
Mr. Bell, and other witnesses observed the City's municipal court judge continuing – at the City
Prosecutor's request – to incarcerate people who were too poor to pay their debts without any
meaningful inquiry into their ability to pay.

20.      When Mr. Bell was ordered to complete more than 500 hours of public service to
satisfy his debt, he specifically requested a public service work program assignment that would
make accommodations for his disabilities.  The City's municipal court judge indicated that
appropriate accommodations would be made.  However, when Mr. Bell reported for public
service on September 1, 2015, he was told that he would be required to perform strenuous
physical labor.  There were no accommodations made for his disability.

21.      Also on September 1, 2015, Mr. Bell appeared before the same municipal court
judge who had ordered him to perform public service and again requested an assignment that
makes accommodations for his disability.  The municipal court judge insisted that the City had
no obligation to offer the option of public service to disabled people and – over Mr. Bell's

objections that he was too poor to pay – placed him on a payment plan.  The judge did not explain the terms of the payment plan.

22.     Mr. Bell was placed on a $25.00 per month payment plan by one of the City's municipal court clerks.  The City's clerk directed Mr. Bell to sign an electronic signature pad without any explanation of what he was signing and without providing him an opportunity to view the "Time Payment Agreement" to which his electronic signature would ultimately be affixed.  The City's clerk then printed the "Time Payment Agreement," which included Mr. Bell's electronic signature, and gave Mr. Bell a copy.  At no point did the City's clerk explain the terms of the agreement to Mr. Bell.

### Plaintiff James Sheppard

23.     Mr. James Sheppard is a 61-year-old individual with physical disabilities.  He is a resident of Jackson, Mississippi.

24.     On or about July 4, 2015, Mr. Sheppard was arrested for possession of an open container of alcohol and possession of marijuana.  He was brought to the City's Municipal Court on July 6, 2015.

25.     At the Municipal Court, the City's prosecutor alleged that Mr. Sheppard owed $2,882.50 related to traffic violations in 2003 and possession of drug paraphernalia in 2009.  The City's prosecutor demanded that Mr. Sheppard pay $2,882.50 or go to jail.

26.     Mr. Sheppard is hard of hearing.  No accommodations were made to ensure that he understood the court proceedings.

27.     Mr. Sheppard is disabled and therefore unable to work.  On the date Mr. Sheppard was brought to the City's Municipal Court, his only income was a small monthly check that he receives through the Social Security and Supplemental Security Income disability program.

Given his limited income, Mr. Sheppard was subsisting below the federal poverty level. Indeed, Mr. Sheppard relied on the Supplemental Nutrition Assistance Program (SNAP or "food stamps") to feed himself. Mr. Sheppard does not own a house, car, or any other significant assets.

28. Consistent with standard policy and practice, the City's public defender did not meet with Mr. Sheppard prior to or during the hearing to discuss the allegations and charges against him or his ability to pay. The City's public defender made no attempt to review the alleged charges, fines, fees, and costs or to determine whether the records relied upon by the City were accurate. The City's public defender, pursuant to standard policy and practice, made no request that the court consider Mr. Sheppard's ability to pay his alleged debts.

29. Pursuant to standard policy and practice, neither the City's prosecutor nor the City's municipal court judge made any inquiry into Mr. Sheppard's ability to pay or into any alternatives to imprisonment as required by United States and Mississippi law. Instead, the prosecutor requested and the judge ordered that Mr. Sheppard "pay or stay." Because Mr. Sheppard was unable to pay the thousands of dollars demanded by the City, he was incarcerated. *See* Ex. B.

30. The City's public defender did not contest the lawfulness of the "pay or stay" order or otherwise object to the treatment of Mr. Sheppard.

31. Due to his disabilities, Mr. Sheppard was unable to work off his fines at the County Penal Farm. The penal farm was also unable to provide Mr. Sheppard with adequate medical care, and thus he was incarcerated at the dangerous and overcrowded Hinds County Jail.

For more than twenty-five (25) days, Mr. Sheppard – like Mr. Bell – slept on the concrete floor of a holding cell in the booking unit of the jail without a mattress or cushion of any sort.[5]

32.     Mr. Sheppard began sitting out his debt at the jail at the rate of $25.00 per day. At that rate, he would have spent approximately 115 days in jail before he was released.  If not for his disabilities, Mr. Sheppard would have been allowed by the City to work off his debt at the penal farm at the rate of $58.00 per day, which would have taken him approximately 50 days.

33.     On August 28, 2015 – fifty-three days after Mr. Sheppard was imprisoned at the jail – undersigned counsel requested that one of the City's municipal court judges reconsider Mr. Sheppard's incarceration.  Through undersigned counsel, Mr. Sheppard argued that he was too poor to pay his debt in full, and thus that the City must offer him some alternative way to satisfy his debt.  Because of the City's policies and practices, this was the first time that any inquiry was made into Mr. Sheppard's ability to pay.  The City's municipal court judge eventually ordered that Mr. Sheppard be released and placed him on a $25.00 per month payment plan.  Mr. Sheppard was not brought to the Municipal Court for the hearing and no written copy of the payment plan or court order was provided to Mr. Sheppard at the time of his release.

### Plaintiff Marteze Harris

34.     Marteze Harris is a 25-year-old resident of Jackson, Mississippi.

35.     On or about July 23, 2015, Mr. Harris was arrested and brought to the City's Municipal Court.  At the Municipal Court, the City's prosecutor alleged that Mr. Harris owed $5,650.00 related to traffic violations and misdemeanor offenses.

36.     The City's prosecutor demanded that Mr. Harris pay the $5,650.00 in full or go to jail.

---

[5] Like Mr. Bell, Mr. Sheppard was moved to a housing unit and provided with a bed only after complaints were made by undersigned counsel.

37.     On July 23, 2015, Mr. Harris was unemployed.   He had not had a job, or any steady source of income, since 2010.  Mr. Harris did not have a checking account, a savings account, or any significant assets.  Prior to his arrest, he was living with his mother and his sister and was helping to care for his disabled niece.

38.     Consistent with standard policy and practice, the City's public defender did not meet with Mr. Harris prior to or during the hearing to discuss the allegations and charges against him or his ability to pay.  The City's public defender made no attempt to review the alleged charges, fines, fees, and costs or to determine whether the records relied upon by the City were accurate.  The City's public defender, pursuant to standard policy and practice, made no request that the court consider Mr. Harris' ability to pay.

39.     Pursuant to standard policy and practice, neither the City's prosecutor nor the City's municipal court judge made any inquiry into Mr. Harris' ability to pay or into any alternatives to imprisonment as required by United States and Mississippi law.  Instead, the prosecutor requested and the judge ordered that Mr. Harris "pay or stay."  Because Mr. Harris was unable to pay the thousands of dollars demanded by the City, he was incarcerated.  *See* Ex. C.

40.     The City's public defender did not contest the lawfulness of the "pay or stay" order or otherwise object to the treatment of Mr. Harris.

41.     Mr. Harris began "working off" his debt at the penal farm at the rate of $58.00 per day.  At that rate, he would have spent at least 97 days in jail before he was released.[6]

42.     On August 24, 2015 – more than a month after Mr. Harris was imprisoned at the penal farm – undersigned counsel requested that one of the City's municipal court judges

---

[6] On days that a person does not work – for example, on Saturday and Sunday – or is unable to work, he is given only $25.00 credit.

reconsider Mr. Harris' incarceration. Through undersigned counsel, Mr. Harris argued that he was too poor to pay his debt and thus that the City must offer him an opportunity to perform public service or some other alternative to payment or incarceration. Because of the City's policies and practices, this was the first time that any inquiry was made into Mr. Harris' ability to pay. Despite Mr. Harris' poverty, the City's prosecutor argued (again) that he should remain in jail and continue to "work off" off his debt. The municipal court judge declined to release Mr. Harris.

43.    Two days later, on August 26, 2015, undersigned counsel asked another municipal court judge to reconsider Mr. Harris' incarceration. Once again, through undersigned counsel, Mr. Harris proffered evidence of his indigence and argued that he was too poor to pay his debt and thus that the City must offer him an opportunity to perform public service or some other alternative to payment or incarceration. Once again, despite Mr. Harris' poverty, the City's prosecutor argued that he should remain in jail and continue to "work off" off his debt. This time, the judge released Mr. Harris and ordered him to satisfy his debt through the City's public service work program.

44.    Initially, the Court informed Mr. Harris that he had "worked off" more than $1,000.00 of his $5,650.00 debt at the penal farm. Indeed, at $58.00 per day, Mr. Harris would have worked off nearly $1,800.00 of his debt in the month he spent at the farm. However, the "Public Service Work Agreement" provided to Mr. Harris by one of the City's clerks alleges that he owes $5,138.60. *See* Ex. D. When undersigned counsel challenged this amount, the clerk informed the Municipal Court judge that she had "found some more fines." The judge refused to consider Mr. Harris' objection to the amount because, according to the judge, the case had already taken up "too much of [his] time."

### Plaintiff Domonic Butler

45.     Domonic Butler is a 27-year-old resident of Jackson, Mississippi.

46.     On or about June 22, 2015, Mr. Butler was arrested and brought to the City's Municipal Court.  At the Municipal Court, the City's prosecutor alleged that Mr. Butler owed $6,775.01 for traffic violations and a misdemeanor offense.

47.     The City's prosecutor demanded that Mr. Butler pay the $6,775.01 in full or go to jail.

48.     Mr. Butler was unemployed at the time of his arrest and had no source of income. Mr. Butler, his partner, and their 1-year-old child were living with Mr. Butler's mother.  Mr. Butler does not own a house, a car, or any other significant assets.

49.     Consistent with standard policy and practice, the City's public defender did not meet with Mr. Butler prior to or during the hearing to discuss the allegations and charges against him or his ability to pay.  The City's public defender made no attempt to review the alleged charges, fines, fees, and costs or to determine whether the records relied upon by the City were accurate.  The City's public defender, pursuant to standard policy and practice, made no request that the court consider Mr. Butler's ability to pay his alleged debts.

50.     Pursuant to standard policy and practice, neither the City's prosecutor nor the City's municipal court judge made any inquiry into Mr. Butler's ability to pay or into any alternatives to imprisonment as required by United States and Mississippi law.  Instead, the prosecutor requested and the judge ordered that Mr. Butler "pay or stay."  Because Mr. Butler was unable to pay the thousands of dollars demanded by the City, he was incarcerated. *See* Ex. E.

12

51.     The City's public defender did not contest the lawfulness of the "pay or stay" order or otherwise object to the treatment of Mr. Butler.

52.     Mr. Butler initially began "working off" his debt at the penal farm at the rate of $58.00 per day.  However, as a result of a health condition, Mr. Butler had to be transported to a hospital after his first day of work and was removed from the work crew.  Mr. Butler then began "sitting out" his debt at the penal farm at the rate of $25.00 per day.  He was eventually given a new work assignment and again began "working off" his debts.  Even at the rate of $58.00 per day, Mr. Butler would have served at least 116 days in jail before he was released.

53.     On September 17, 2015 – nearly three (3) months after Mr. Butler was imprisoned at the penal farm – undersigned counsel requested that one of the City's municipal court judges reconsider Mr. Butler's incarceration.  Through undersigned counsel, Mr. Butler argued that he was too poor to pay his debt and thus that the City must offer him an opportunity to perform public service or some other alternative to payment or incarceration.  Because of the City's policies and practices, this was the first time that any inquiry was made into Mr. Butler's ability to pay.  The City's municipal court judge eventually released Mr. Butler and ordered him to complete more than 400 hours of public service to satisfy his debts.

### Plaintiff Michael Davis

54.     Michael Davis is a 34-year-old individual with a physical disability.  He is a resident of Jackson, Mississippi.

55.     On or about April 13, 2015, Mr. Davis was arrested and brought to the City's Municipal Court.  At the Municipal Court, the City's prosecutor alleged that Mr. Davis owed $19,403.81 for traffic violations and misdemeanor offenses.

56.     The City's prosecutor demanded that Mr. Davis pay the $19,430.81 in full or go to jail.

57.     On the date Mr. Davis was brought to the City's Municipal Court, his only income was a small monthly check that he receives through the Social Security and Supplemental Security Income disability program.  Given his limited income, Mr. Davis was subsisting below the federal poverty level.  Mr. Davis does not own a house, a car, or any other significant assets.

58.     Consistent with standard policy and practice, the City's public defender did not meet with Mr. Davis prior to or during the hearing to discuss the allegations and charges against him or his ability to pay.  The City's public defender made no attempt to review the alleged charges, fines, fees, and costs or to determine whether the records relied upon by the City were accurate.  The City's public defender, pursuant to standard policy and practice, made no request that the court consider Mr. Davis' ability to pay his alleged debts.

59.     Pursuant to standard policy and practice, neither the City's prosecutor nor the City's municipal court judge made any inquiry into Mr. Davis' ability to pay or into any alternatives to imprisonment as required by United States and Mississippi law.  Instead, the prosecutor requested and the judge ordered that Mr. Davis "pay or stay."  Because Mr. Davis was unable to pay the thousands of dollars demanded by the City, he was incarcerated.  *See* Ex. F.[7]

60.     The City's public defender did not contest the lawfulness of the "pay or stay" order or otherwise object to the treatment of Mr. Davis.

---

[7] Mr. Davis was also sentenced to serve 210 days in prison.  However, by earning administrative reductions, Mr. Davis completed that sentence well before he was released from jail.

61.    Mr. Davis began "working off" his debt at the penal farm at the rate of $58.00 per day.  At that rate, he would have spent at least 335 days in jail before he was released.

62.    On September 17, 2015 – more than six (6) months after Mr. Davis was imprisoned at the penal farm – undersigned counsel requested that one of the City's municipal court judges reconsider Mr. Davis' incarceration.  Through undersigned counsel, Mr. Davis argued that he was too poor to pay his debt and thus that the City must offer him an opportunity to perform public service or some other alternative to payment or incarceration.  Because of the City's policies and practices, this was the first time that any inquiry was made into Mr. Davis's ability to pay.  The City's municipal court judge subsequently ordered that Mr. Davis be released and placed him on a $25.00 per month payment plan.

### Plaintiff Ricky Lambert

63.    Ricky Lambert is a 41-year-old resident of Flowood, Mississippi.

64.    On or about August 14, 2015, Mr. Lambert was arrested and brought to the City's Municipal Court because he allegedly owed the City money for traffic violations, including a 2010 *in absentia* conviction for driving under the influence.

65.    At the Municipal Court, the City's prosecutor demanded that Mr. Lambert pay $2,800.23 or go to jail.

66.    Mr. Lambert did not have a steady source of income at the time of his arrest.  He does not have any cash, a checking account, a savings account, or any significant assets.  He and his partner were living with her parents.

67.    Consistent with standard policy and practice, the City's public defender did not meet with Mr. Lambert prior to or during the hearing to discuss the allegations and charges against him or his ability to pay.  The City's public defender made no attempt to review the

alleged charges, fines, fees, and costs or to determine whether the records relied upon by the City were accurate.  The City's public defender, pursuant to standard policy and practice, made no request that the court consider Mr. Lambert's ability to pay his alleged debts.

68.     Pursuant to standard policy and practice, neither the City's prosecutor nor the City's municipal court judge made any inquiry into Mr. Lambert's ability to pay or into any alternatives to imprisonment as required by United States and Mississippi law.  Instead, the prosecutor requested and the judge ordered that Mr. Lambert "pay or stay."  Because Mr. Lambert was unable to pay the thousands of dollars demanded by the City, he was incarcerated. *See* Ex. G.[8]

69.     The City's public defender did not contest the lawfulness of the "pay or stay" order or otherwise object to the treatment of Mr. Lambert.

70.     Mr. Lambert began "working off" his debt at the penal farm at the rate of $58.00 per day.  At that rate, he would have spent at least 48 days in jail before he was released.

71.     On September 17, 2015 – more than a month Mr. Lambert was imprisoned at the penal farm – undersigned counsel requested that one of the City's municipal court judges reconsider Mr. Lambert's incarceration.  Through undersigned counsel, Mr. Lambert argued that he was too poor to pay his debt and thus that the City must offer him an opportunity to perform public service or some other alternative to payment or incarceration.  Because of the City's policies and practices, this was the first time that any inquiry was made into Mr. Lambert's ability to pay.  The City's municipal court judge eventually released Mr. Lambert and ordered him to complete more than 250 hours of public service to satisfy his debt.

72.     Mr. Lambert was placed on public service work program plan by one of the City's municipal court clerks.  The City's clerk directed Mr. Lambert to sign an electric signature pad

---

[8] Mr. Lambert was also sentenced to serve two (2) days in jail.

without any explanation of what he was signing and without providing him an opportunity to view the "Public Service Work Agreement" to which his electronic signature would ultimately be affixed. The City's clerk then printed the "Public Service Work Agreement," which included Mr. Lambert's electronic signature, and gave Mr. Lambert a copy.

73.    The "Public Service Work Agreement" – which was provided to Mr. Lambert at approximately 11:00 a.m. on September 17, 2015 – orders Mr. Lambert to report for service "on **the 17th day of September, 2015** at 8:00 o'clock." Ex. H (emphasis in original). The agreement does not inform Mr. Lambert *where* to report. *See id.*[9]

### Plaintiff Jarmale Walker

74.    Jarmale Walker is a 26-year-old resident of Jackson, Mississippi.

75.    Mr. Walker was arrested on or about July 10, 2015. Three days later, on July 13, 2015, he was taken to the City's Municipal Court.[10]

76.    At the Municipal Court, the City's prosecutor demanded that Mr. Walker pay $1,199.65 for fines, fees and costs related to a traffic violation that he allegedly committed seven days after his sixteenth birthday in 2004. Alternatively, the prosecutor requested that the court incarcerate Mr. Walker.

77.    On July 13, 2015, Mr. Walker was unemployed and had no cash, savings, or significant assets. Mr. Walker was also unemployed, and just a teenager, at the time of the 2004 traffic violation.

78.    Consistent with standard policy and practice, the City's public defender did not meet with Mr. Walker prior to or during the hearing to discuss the allegations and charges

---

[9] When undersigned counsel notified the clerk of these problems, she used an ink pen to change the reporting date to September 21 and wrote "Metro Center Mall" on the order to indicate where Mr. Lambert should report.

[10] Mr. Walker was arrested for "disorderly conduct." With respect to this charge, he was released on his recognizance on July 13, 2015.

against him or his ability to pay. The City's public defender made no attempt to review the alleged charges, fines, fees, and costs or to determine whether the records relied upon by the City were accurate. The City's public defender, pursuant to standard policy and practice, made no request that the court consider Mr. Walker's ability to pay.

79.     Pursuant to standard policy and practice, neither the City's prosecutor nor the City's municipal court judge made any inquiry into Mr. Walker's ability to pay or into any alternatives to imprisonment as required by United States and Mississippi law. Instead, the prosecutor requested and the judge ordered that Mr. Walker "pay or stay." Because Mr. Walker was unable to pay the $1,199.65 demanded by the City, he was incarcerated. *See* Ex. I.

80.     The City's public defender did not contest the lawfulness of the "pay or stay" order or otherwise object to the treatment of Mr. Walker.

81.     Mr. Walker was incarcerated at the penal farm where, pursuant to the City's practice and policy, he "worked off" his fines at the rate of $58.00 per week day and $25.00 per weekend day. He was released from the penal farm on August 5, 2015, twenty-six (26) days after his arrest.

### B.  The Defendants' Policies and Practices

82.     The treatment of the Plaintiffs was caused by and is representative of the City's policies and practices for collecting debts from the fines, fees, and costs assessed for traffic violations and other misdemeanor offenses committed within the jurisdiction of the City.

83.     The City's policy and practice is to assess fines, fees, and costs upon a conviction for a traffic violation or other misdemeanor offense.[11] If the person can afford to pay the total debt, he or she is permitted to pay, the case is closed, and the person is free to go. If the person

---

[11] The fees and costs include but are not limited to a "computer fee," "admin processing fee," "affidavit fee," "court constituent fee," "crime stopper fee," "computerized crime prevention fee," "municipal court enhancement," and "Jackson enhancement fee."

18

cannot afford to pay the total debt, the City's policy and practice is to put the person on a "payment plan" or send him or her directly to jail to "work off" or "sit out" his or her debt. There is no meaningful inquiry into the person's ability to pay or to comply with the terms of a payment plan.

84.     The City, through one of its Municipal Court clerks, sets the terms of the payment plan. There is no meaningful inquiry into the person's ability to comply with the terms of the payment plan. Often, the clerk instructs the person to "sign" the agreement – through an electronic signature pad – before he or she is told what she is signing.

85.     When a person on a payment plan fails to make a payment, he or she – pursuant to City policy and practice – is held in contempt without any meaningful inquiry into the reason that he or she failed to pay. Often, the person is not even present in court when he or she is held in contempt (i.e. he or she is held in contempt *in absentia*).

86.     As a matter of policy and practice, the contempt procedures required by Mississippi law and the United States Constitution are not followed.

87.     When a person is held in contempt for a failure to pay, the City's policy and practice is to add fines, fees, and costs to the debts already owed by the person, including a "contempt fee."

88.     If, as often happens, the person is not present in court when he or she is found to be in contempt, a warrant is issued for the person's arrest. When an arrest warrant is issued and executed, the City adds fees and costs to the debts already owed by the person, including a "warrant fee."

89.     When a person is brought into court after an arrest, the City's policy is to demand that they pay their total debt—or a significant portion of their debt—immediately or be

incarcerated in the Hinds County Jail or the Hinds County Penal Farm. Once incarcerated, the person "sits out" his or her debt at the rate of $25.00 per day or, if he or she is physically able, "works off" the debt at the rate of $58.00 per day. The City calls these orders "pay or stay" orders.

90.     It is the policy and practice of the City, through its City Prosecutor, to request a "pay or stay" order regardless of a person's ability to pay. Even if a person is able to pay some portion of the debt, it is the policy and practice of the City, through its City Prosecutor, to request that a person be incarcerated unless he can pay all, or a large portion of, the debt.[12]

91.     The City's policy and practice is to conduct no inquiry into the person's ability to pay before requesting and issuing a "pay or stay" order. The policy and practice is to make no findings concerning ability to pay, alternatives to incarceration, whether the debt is valid or owed, or any other legally or constitutionally relevant question. Moreover, the cursory proceedings that precede a "pay or stay" order (commonly lasting only a few minutes) typically do not even identify the specific debts owed or the cases in which they were supposedly incurred and do not provide a debtor with a meaningful opportunity to contest the validity of the debt.

92.     Although the City employs a public defender and although the public defender is often present in court during these proceedings, the public defender provides no meaningful representation to jailed debtors and fails entirely to ensure that the procedures required by federal and Mississippi law prior to incarcerating a person for nonpayment are followed. As a matter of policy and practice, the public defender fails to conduct an inquiry into the person's circumstances, fails to put on any evidence, fails to review the person's case file(s) and payment records, fails to object to the City's illegal requests, fails to inform alleged debtors of their rights,

---

[12] In addition to demanding that a person pay his or her total debt, the City occasionally asks for "the standard 65%" of the total.

and fails to request hearings and inquiries that comply with basic constitutional rights. After a person is sent to jail, the public defender contracted by the City fails even to inform the person of their right to appeal.

93. The City's policy and practice of failing to appoint adequate counsel leaves indigent defendants without any meaningful opportunity to raise constitutional and statutory arguments and defenses against the experienced prosecutors who represent the City. Indigent defendants are also effectively left alone to perform tasks that are difficult even for experienced attorneys. These tasks include, but are not limited to: (a) navigating the origin and determining the validity of the fines, fees, and costs assessed by the City, a process that involves a complicated inquiry into the application of constitutional, state, and local law and an understanding of local practice and specialized terminology; and (b) making sense of the City's complex and disorganized record-keeping – which is often deficient in material ways that become apparent only after careful examination – to determine whether the debts alleged by the City are supported by the City's accounting documents, receipts, and other records.[13]

94. The City's policy and practice of failing to appoint adequate counsel at all stages of Municipal Court proceedings – when combined with the City's policy and practice of convicting defendants *in absentia* – also means that the vast majority of those individuals subsequently jailed for failing to pay their debts were without constitutionally adequate representation (or any representation at all) for the underlying traffic, misdemeanor, and contempt proceedings in which the fines, fees, and costs were assessed.

95. The City also maintains a policy and practice of refusing to allow anyone other than an attorney to examine the Municipal Court's files, making it nearly impossible for indigent

---

[13] In many cases, this involves examining court orders, accounting documents, receipts, and other records from multiple court files.

defendants to represent themselves in the Municipal Court or on appeal. Indeed, even attorneys have difficulty accessing the court's files.[14]

96.     The City's policies and practices have created a culture of fear among the City's poorest residents, who are afraid even to appear in the City's court to explain their indigence and inability to pay because they know they will be incarcerated by the City without any meaningful process.

97.     The same fear motivates many very poor residents of the City to sacrifice expenditures on food, clothing, utilities, home repairs, and other basic necessities of life in order to scrape together money to pay their debt to the City.

98.     The City's debt collection policies and practices also place enormous pressure on family members – who have no legal obligation to pay any money to the City – to come up with money to get their loved ones released from jail. Several City employees, including municipal court judges, have commented recently that incarceration is an effective method for extracting money from the family and friends of indigent defendants.

### Class Action Allegations

99.     Plaintiffs bring this Class action on behalf of themselves and all others similarly situated, for the purpose of asserting the claims alleged in this Complaint on a common basis.

100.     A class action is a superior means, and the only practicable means, by which Plaintiffs and unknown Class members can challenge the City's unlawful debt-collection scheme.

101.     This action is brought and may properly be maintained as a Class action pursuant

---

[14] Numerous Municipal Court clerks and other employees refused to allow undersigned counsel an opportunity to review the named Plaintiffs' Municipal Court files. The Municipal Court administrator has acknowledged that there is no established policy for providing copies of public court files to attorneys, defendants or interested members of the public.

to Rule 23(a)(1)-(4), Rule 23(b)(2), and Rule 23(b)(3) of the Federal Rules of Civil Procedure.

102.   This action satisfies the numerosity, commonality, typicality, and adequacy requirements of those provisions.

103.   The Plaintiffs propose two Classes: a Declaratory and Injunctive Class and a Damages Class.  The Declaratory and Injunctive Class is defined as:  All persons who currently owe or who will incur debts to the City of Jackson from fines, fees, and costs arising from cases in the City's Municipal Court.  The Damages Class is defined as: All persons who are and were incarcerated by the City for non-payment of debts from fines, fees, and costs arising from cases in the City's Municipal Court.

**A.   Numerosity. Fed. R. Civ. P. 23(a)(1)**

104.   The City has incarcerated many hundreds of its residents for non-payment of debts in each of the past several years.

105.   The City followed and follows the same debt-collection policies, practices, and procedures to incarcerate the Class members.  For example, pursuant to the City's policies and practices, those incarcerated by the City for non-payment did not receive meaningful inquiries into their ability to pay or adequate representation by counsel as required by United States and Mississippi law.  Pursuant to the City's practices and policies, no determinations of indigence or evaluations of alternatives to incarceration were made, and the City provided none of the relevant federal and state protections for debtors.  All of those jailed are informed of the City's policy of requiring them to sit out their debts at $25.00 per day or work off their debts at $58.00 per day.

106.   Those who still owe debts to the City or who will incur such debts will be subjected to the same ongoing policies and practices absent the relief sought in this Complaint.

B.     **Commonality. Fed. R. Civ. P. 23(a)(2).**

107.   The relief sought is common to all members of the Class, and common questions

of law and fact exist as to all members of the Class.   The Plaintiffs seek relief concerning

whether the City's policies and practices violated their rights and relief mandating the City to

change its policies and practices so that the Plaintiffs' rights will be protected in the future.

108.   Among the most important, but not the only, common questions of fact are:

- Whether the City has a policy and practice of failing to conduct meaningful inquiries into the ability of a person to pay before ordering the person's incarceration for non-payment of fines, fees, and costs;

- Whether the City has a policy and practice of having debtors sit out their debts at the jail or penal farm at the rate of $25.00 per day, or work off their debts at the rate of $58.00 per day;

- Whether the City provides notice to debtors that their ability to pay will be a relevant issue at the hearings at which they are jailed and whether the City makes findings concerning ability to pay and alternatives to incarceration;

- What procedural mechanisms, if any, the City uses as matter of policy and practice to determine indigence and ability to pay;

- Whether the City applies state procedural and state and federal substantive law designed to determine indigence and to protect indigent debtors;

- Whether the City provides constitutionally adequate representation to those incarcerated for unpaid debts in the proceedings that result in their incarceration;

- Whether the City has a policy and practice of threatening debtors with incarceration for unpaid debts without informing them of their constitutional rights.

109.   Among the most important common question of law are:

- Whether people are entitled to a meaningful inquiry into their ability to pay before being incarcerated by the City for non-payment of debts;

- Whether people who cannot afford to pay their debts to the City are entitled to the consideration of alternatives to incarceration before being incarcerated for non-payment of those debts;

- Whether indigent people are entitled to constitutionally adequate representation by an appointed attorney in proceedings initiated and litigated by City prosecutors that result in their incarceration;

- Whether the City can employ incarceration, threats of incarceration, and other harsh debt-collection measures (such as ordering payment of significant portions of a person's public assistance benefits) against debtors who cannot afford immediately to pay their debts in full;

- Whether the City can jail people for non-payment of debt and require them to "sit out" their debts at $25.00 per day unless the person is willing and able to perform labor, in which case they "work off" their debts at $58.00 per day.

110.    These common legal and factual questions arise from one central scheme and set of policies and practices: the City's Municipal Court debt-collection scheme.  The City operates this scheme openly and in materially the same manner every day.  The material components of the scheme do not vary from Class member to Class member, and the resolution of these legal and factual issues will determine whether all of the members of the class are entitled to the constitutional relief that they seek.

**C.    Typicality.  Fed. R. Civ. P. 23(a)(3).**

111.    The named Plaintiffs' claims are typical of the claims of the members of the Classes, and they have the same interests in this case as all other members of the Classes that they represent.  Each of them suffered injuries from the City's failure to comply with the basic constitutional provisions detailed below.  The answer to whether the City's scheme of policies and practices is unconstitutional will determine the claims of the named Plaintiffs and every other Class member.

112.    If the named Plaintiffs succeed in their claims that the City's policies and practices concerning debt collection for fines, fees, and costs violate the law in the ways alleged in each claim of the Complaint, then that ruling will likewise benefit every other member of the Injunctive and Damages Classes.

25

**D.** **Adequacy. Fed. R. Civ. P. 23(a)(4).**

113.     The named Plaintiffs are adequate representatives of the Classes because they are members of the Classes and because their interests coincide with and are not antagonistic to those of the Classes.   There are no known conflicts of interest among Class members, all of whom have a similar interest in vindicating the constitutional rights to which they are entitled.

114.     Plaintiffs are represented by attorneys from Equal Justice Under Law[15] and the MacArthur Justice Center[16] who have experience litigating complex civil rights matters in federal court and knowledge of both the details of the City's scheme and the relevant constitutional and statutory law.

115.     Counsel's efforts have so far involved substantial investigation, including interviews with witnesses, City employees, jail and penal farm inmates, attorneys practicing in the City's Municipal Court, community members, statewide experts in the functioning of Mississippi's municipal courts, and national experts in debt collection, forced labor, and constitutional law.

116.     Counsel and their agents have observed and participated in courtroom hearings in the City of Jackson's Municipal Court in order develop an understanding of local policies and practices regarding debt collection.  Counsel have studied the way that these systems function in other cities across the country in order to investigate the wide array of constitutional debt collection practices available to municipalities.

117.     As a result, counsel has devoted substantial time and resources to becoming familiar with the City's scheme and with the relevant state and federal laws and procedures that should govern it.

---

[15] Equal Justice Under Law is a non-profit civil rights organization based in Washington, D.C.  The organization is funded in part by the Harvard Law School Public Service Venture Fund.

[16] The MacArthur Justice Center is a non-profit public interest law firm housed at the University of Mississippi.

118.    Counsel from Equal Justice Under Law was recently the lead attorney in a landmark federal civil rights class action lawsuit against the City of Montgomery, Alabama for engaging in similar practices.  In that case, the United States District Court of the Middle District of Alabama issued a preliminary injunction condemning and forbidding the City of Montgomery's similar incarceration of impoverished people with unpaid debts, and the case was successfully settled after the City agreed to compensate the Plaintiffs and to the entry of an injunction reforming its entire municipal debt-collection scheme.  *See Mitchell et al. v. City of Montgomery*, 14-cv-186-MHT (M.D. Ala. 2014).  Counsel from Equal Justice Under Law is also the lead attorney in two cases involving the similar treatment of impoverished people in St. Louis County, Missouri's municipal courts, *see Jenkins et al. v. City of Jennings*, 15-cv-252-CEJ (E.D. Mo. 2015); *Fant et al. v. City of Ferguson*, 15-cv-253-AGF (E.D. Mo. 2015), and in a suit alleging similar unconstitutional jailing of indigent people in New Orleans.  *See Cain et al. v. City of New Orleans, et al.,* 2:15-cv-04479-SSV-JCW (E.D. La. 2015).[17]

119.    Counsel from the MacArthur Justice Center and Equal Justice Under Law also represent the plaintiffs in a federal class action lawsuit challenging the fixed "bail schedule" scheme employed by the City of Moss Point, Mississippi.  *See Thompson v. Moss Point*, 15-cv-182-LG (S.D. Miss. 2015).  Like the City's debt collection scheme, the City of Moss Point's fixed "bail schedule" scheme results in the unconstitutional jailing of numerous impoverished people.

120.    The interests of the members of the Class will be fairly and adequately protected by the Plaintiffs and their attorneys.

---

[17] Counsel from Equal Justice Under Law is also lead attorney in several recent class action lawsuits challenging the use of money bail to keep impoverished people in jail prior to trial, including, among others, *Jones et al. v. City of Clanton,* 15-cv-34 (M.D. Ala. 2015); *Pierce et. al. v. City of Velda City*, 15-cv-570 (E.D. Mo. 2015); *Powell et al. v. City of St. Ann,* 4:15-cv-840 (E.D. Mo. 2015); *Cooper et al. v. City of Dothan,* 1:15-cv-425-WKW (M.D. Ala. 2015).

### E.     Rule 23(b)(2)

121.     Class action status is appropriate because the City, through the policies, practices and procedures that make up its Municipal Court debt collection scheme, have acted in the same unconstitutional manner with respect to all members of the Declaratory and Injunctive Class. Thus, a declaration that people in the City are entitled, as a matter of federal law, to a meaningful inquiry into their ability to pay and an evaluation of alternatives to incarceration before they are jailed by the City for non-payment will apply to each Class member.  The same applies to rulings on the other claims, including: that the City cannot imprison Class members for debts and then coerce them into working to reduce their debts by an additional $33.00 per day; that the City cannot collect debts from Class members in a manner that violates and evades all of the relevant protections for other judgment debtors; and that the City cannot imprison Class members for unpaid debts without providing them with constitutionally adequate representation.

122.     Injunctive relief compelling the City to comply with these constitutional rights will similarly protect each member of the Class from again being subjected to the City's unlawful policies and practices with respect to the debts that they still owe and protect those who will incur such debts in the future from the same unconstitutional conduct.   Therefore, declaratory and injunctive relief with respect to the Class as a whole is appropriate.

### F.     Rule 23(b)(3)

123.     Class treatment under Rule 23(b)(3) is also appropriate because the common questions of law and fact overwhelmingly predominate in this case.  This case turns, for every Plaintiff, on what the City's policies and practices are and on whether those policies are lawful.

124.     The common questions of law and fact listed above are dispositive questions in the case of every member of the Classes.  The question of liability can therefore be determined

on a class-wide basis. Class-wide treatment of liability is a far superior method of determining the content and legality of the City's policies and practices than individual suits by hundreds or thousands of people. The question of damages will also be driven by class-wide determinations, such as the policies, practices, and conditions at the jail and penal farm. To the extent that individual damages will vary, they will vary depending in large part on the amount of time that a person was unlawfully incarcerated. Determining damages for individual Class members can thus typically be handled in a ministerial fashion based on easily verifiable records of the length of unlawful incarceration. If need be, individual hearings on Class-member specific damages based on special circumstances can be held after Class-wide liability is determined—a method far more efficient than the wholesale litigation of hundreds or thousands of individual lawsuits.

125.    Plaintiffs seek the following relief and hereby demand a jury in this cause for all matters so appropriate.

### Claims for Relief

**Count One:   The City Violated Plaintiffs' Rights By Incarcerating Them For Non-Payment of Debts Without Any Inquiry Into Their Ability To Pay.**

126.    Plaintiffs incorporate by reference the allegations in paragraphs 1-125.

127.    The Fourteenth Amendment's due process and equal protection clauses have long prohibited imprisoning a person for the failure to pay money owed to the government if that person is unable to pay and without following basic procedures to make that determination.[18] The City violated the Plaintiffs' rights by incarcerating them when they could not afford to pay the debt allegedly owed and without following the basic constitutional process required.

---

[18] Mississippi law also prohibits these practices. *See* Miss. Code Ann. § 99-19-20. *See also Cassibry v. State*, 453 So.2d 1298, 1299 (Miss. 1984) ("So long as [a person] is 'financially unable to pay a fine' and the trial court so finds, he may not be imprisoned, *period*.") (citing Miss. Code Ann. § 99-19-20(2)) (emphasis in original).

128.    The City violated the Plaintiffs' rights by incarcerating them, and by threatening to incarcerate them, without conducting any inquiry into their ability to pay and without conducting any inquiry into alternatives to imprisonment as required by the United States Constitution. The City similarly did not provide the required notice to the Plaintiffs concerning the relevant issues at any hearing contemplating their imprisonment, provide a meaningful opportunity for the Plaintiffs to present evidence of their inability to pay, or make findings concerning their ability to pay.

129.    The City's policy and practice of incarcerating people when they cannot afford to pay their debts and of automatically converting monetary fines into days in jail at a rate of $25.00 or $58.00 per day violates the due process and equal protection provisions of the United States Constitution.

**Count Two: The City Violated the Plaintiffs' Rights by Imprisoning Them for Inability to Pay Debts Without Appointing Adequate Counsel.**

130.    Plaintiffs incorporate by reference the allegations in paragraphs 1-129.

131.    The City violated the Plaintiff's right to the effective assistance of counsel under the Sixth and Fourteenth Amendments to the United States Constitution by incarcerating Plaintiffs during proceedings litigated by City prosecutors at which the Plaintiffs did not have the benefit of adequate counsel and did not knowingly, intelligently, and voluntarily waive counsel.

132.    The City's policy of not providing adequate counsel at hearings in which indigent people are ordered to be imprisoned at the jail or penal farm for unpaid debts, which are, in turn, based on convictions for traffic violations and other misdemeanor offenses at which the person was also unrepresented or without adequate counsel, violates the Sixth and Fourteenth Amendments to the United States Constitution.

30

**Count Three: The City's Scheme of Forcing Indigent Prisoners to Labor at the Penal Farm in Order to Work Off Their Debts Violates the Thirteenth Amendment to the United States Constitution and Federal Law.**

133.    Plaintiffs incorporate by reference the allegations in paragraphs 1-132 above.

134.    The City unlawfully incarcerated the Plaintiffs for a monetary debt owed to the City. In addition to being unlawfully incarcerated for failure to pay debts owed to the City, Plaintiffs were, pursuant to the City's practices and policy, coerced with longer unlawful jail terms if they did not "agree" to labor at the County Penal Farm for an extra credit of $33.00 per day toward their debts. This amounts to peonage and forced labor, whereby a person is coerced by threat of legal sanction—i.e. further imprisonment—to work off a debt to a master. It is also an abuse of the legal process that exploited the City's unlawful incarceration of Plaintiffs to force them to accept, in their desperation to end their unlawful incarceration more quickly, the conditions of forced labor.

135.    Plaintiffs allegedly owed the City a monetary debt for traffic violations or other misdemeanor offenses and associated fees and costs. Because Plaintiffs were not imprisoned or sentenced to involuntary servitude as punishment for any crime, the Thirteenth Amendment bars the coerced use of their labor to work off their purely monetary debt. The City's conduct also violates federal statutes, including 18 U.S.C. § 1589 (forced labor under threat of physical restraint or abuse of process), § 1593A (benefitting from peonage); and § 1595 (providing a civil remedy).

**Count Four: The City's Use of Incarceration and Threats of Incarceration to Collect Debts Owed to the City Violates the Equal Protection Clause Because it Imposes Unduly Harsh and Punitive Restrictions on Debtors Whose Creditor is the Government Compared to Those Who Owe Money to Private Creditors.**

136.    Plaintiffs incorporate by reference the allegations in paragraphs 1-135 above.

137.   The United States Supreme Court has held that, when a government seeks to recoup costs of prosecution from indigent defendants—for example, the cost of appointed counsel—it may not take advantage of its position to impose unduly restrictive methods of collection solely because the debt is owed to the government and not to a private creditor.  By incarcerating the Plaintiffs and threatening to incarcerate them, the City takes advantage of their control over the machinery of the penal and police systems to deny debtors the statutory protections that every other debtor may invoke against a private creditor.  This coercive policy and practice constitutes invidious discrimination and violates the fundamental principles of equal protection of the laws.

### Request for Relief

WHEREFORE, Plaintiffs request that this Court issue the following relief:

a. A declaratory judgment that the Defendant City violated Plaintiffs' Fourteenth Amendment due process and equal protection rights by imprisoning them without conducting any meaningful inquiry into their ability to pay or into any alternatives to incarceration;

b. A declaratory judgment that the Defendant City violated Plaintiffs' Sixth and Fourteenth Amendment rights by imprisoning them without providing adequate counsel to represent them at the judicial proceeding(s) that led to their incarceration;

c. A declaratory judgment that the Defendant City violated Plaintiffs' constitutional and statutory rights by coercing them into performing labor at the jail or penal farm in order to work off their debts;

d. A declaratory judgment that the Defendant City violated Plaintiffs' equal protection rights by imposing harsh debt collection measures not imposed on debtors whose creditors are private entities;

e. An order and judgment preliminarily and permanently enjoining the Defendant City from enforcing the above-described unconstitutional policies and practices against Plaintiffs and the Class of similarly situated people that they represent;

f. A judgment compensating the Plaintiffs and the Class of similarly situated people that they represent for the damages that they suffered as a result of the Defendant City's unconstitutional and unlawful conduct;

32

g. An order and judgment granting reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and 18 U.S.C. § 1595, and any other relief this Court deems just and proper.

Respectfully submitted this the 9th of October, 2015,

JACOB W. HOWARD, MSB #103256
MACARTHUR JUSTICE CENTER
767 North Congress Street
Jackson, MS 39202
Tele: (601) 969-0802, Ext. 204
Fax: (601) 969-0804
jhoward@macarthurjustice.org

J. CLIFF JOHNSON, II, MSB #9383
MACARTHUR JUSTICE CENTER
P.O. Box 1848
University, MS 38677-1848
Tele: (602) 915-7629
cjohnson@macarthurjustic.org

*ALEC KARAKATSANIS, D.C. Bar #999294
EQUAL JUSTICE UNDER LAW
916 G Street, NW Suite 701
Washington, DC 20001
Tele: (202)-681-2409
alec@equaljusticeunderlaw.org

*Pending admission *Pro Hac Vice*

*Attorneys for Plaintiffs*

33